1  GEOFFREY A. NERI (SBN 258802)
   Geoff@bnslawgroup.com
2  ROWENNAKETE BARNES (SBN 302037)
   kete@bnslawgroup.com
3  **BROWN, NERI & SMITH LLP**
   11766 Wilshire Blvd., Suite 1670
4  Los Angeles, California 90025
   Tel: (310) 593-9890
5  Fax: (310) 593-9980

6
   Attorneys for Plaintiff
7  Palumbo Design, LLC

8

9

10                 UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13

14  PALUMBO DESIGN, LLC, a California      CASE NO.
    limited liability company,
15
                 Plaintiff,               **COMPLAINT FOR:**
16
          v.                              **(1) ACTUAL FRAUDULENT
17                                            TRANSFER;**
    1169 HILLCREST, LLC, a Nevada         **(2) CONSTRUCTIVE FRAUDULENT
18  limited liability company, NEIL           TRANSFER;**
    MOFFITT, an individual, and DOES 1    **(3) PROMISSORY FRAUD / FRAUD
19  through 10, inclusive,                    IN THE INDUCEMENT;**
                                          **(4) BREACH OF THE IMPLIED
20               Defendants.                  COVENANT OF GOOD FAITH
                                              AND FAIR DEALING;**
21                                        **(5) UNFAIR BUSINESS PRACTICES
                                              – BUS. & PROF. CODE SECTION
22                                            17200;**
                                          **(6) CONSTRUCTIVE TRUST;**
23                                        **(7) ACCOUNTING.**

24
                                          **DEMAND FOR JURY TRIAL**
25

26

27

28

104116.1                         COMPLAINT

Plaintiff Palumbo Design, LLC, for its Complaint against Defendants, and each of them, alleges as follows:

## PARTIES

1.     Plaintiff Palumbo Design, LLC, is a limited liability company organized and existing pursuant to the laws of the State of California.

2.     Upon information and belief, Defendant 1169 Hillcrest, LLC, is a limited liability company organized and existing pursuant to the laws of the State of Nevada.

3.     Upon information and belief, Defendant Neil Moffitt, is an individual resident of the State of Nevada.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiffs and Defendants and the amount in controversy is greater than $75,000.

5.     Venue is proper in this district under 28 U.S.C. § 1391 as a substantial part of the acts or omissions giving rise to the claims described herein occurred in this district and the property that is the subject of the action is situated in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Palumbo Locks In an Investment Opportunity in 1169 Hillcrest

6.     This action arises out of, *inter alia*, Defendants' duplicitous efforts to deny Plaintiff Palumbo Design, LLC ("Palumbo") its agreed-upon forty-percent (40%) share of tens of millions of dollars in anticipated profits on the sale of a luxury home designed and developed by Palumbo.

7.     Palumbo is one of Southern California's premier luxury home designers and has garnered numerous accolades as the designer of some of the most distinctive, high-end homes in the Los Angeles area.  Palumbo's principal is Michael Palumbo, whose career spans almost 35 year.

8.     Mr. Palumbo has designed and completed numerous high-profile custom homes in the exclusive "Golden Triangle" area of Beverly Hills, as well as Bel Air

1
COMPLAINT

104116.1

and the Hollywood Hills, and he enjoys an excellent reputation in the design and development community.

9.    Richard Papalian ("Papalian") is a successful real estate investor. Palumbo and Papalian have worked together on two real estate design and development projects in the past, namely 1201 Laurel Way, Beverly Hills, 90210 and 749 Cloverdale Avenue, Los Angeles, 90036.

10.    In or around January of 2014, Palumbo identified a lucrative investment opportunity in a parcel of real property located at 1169 N. Hillcrest Road, Beverly Hills, California, 90210 ("1169 Hillcrest" or the "Property").

11.    Palumbo intended to design, as well as assemble a team to build, a unique, signature project at 1169 Hillcrest. Palumbo projected that he could design a house at 1169 Hillcrest with a <u>minimum</u> size of 17,000 square feet, at an estimated cost of seventeen million dollars ($17 million) and an estimated sale price of forty-five million dollars ($45 million). Palumbo believed, however, that it would be possible to develop an even bigger house that would sell for as much as ninety million dollars ($90 million).

12.    Palumbo knew that such a result was attainable based, in part, on his knowledge of other properties in the immediate area (in fact, on the same street) that had sold or would be on the market to be sold for seventy to ninety-five million dollars ($70-$95 million). Palumbo told Papalian of the enormous profit potential and Papalian agreed to finance a purchase of the Property and work together with Palumbo on its development.

13.    While the owners of the Property were reluctant to sell, Palumbo eventually negotiated a sale price of sixteen million ($16 million) for the Property. Papalian further negotiated a reduction in the price to fifteen million ($15 million).

**B. Palumbo and Papalian Enter Into Escrow on 1169 Hillcrest**

14.    On or around February 13, 2014, Palumbo and Papalian signed a purchase agreement to purchase the Property for fifteen million dollars ($15 million),

104116.1

1     all cash.

2        15. On or around February 19, 2014, Palumbo and Papalian opened escrow

3 and deposited four hundred and fifty thousand dollars ($450,000.00). By this time,

4 they had answered their due diligence questions and fully secured the opportunity to

5 develop the Property as identified and envisioned by Palumbo.

6        **C. Moffitt Induces Palumbo to Enter Into a Development Deal**

7        16. Before the close of escrow, however, Palumbo was approached by

8 Defendant Neil Moffitt ("Moffitt"), who wanted to get into the deal. Moffitt is a

9 wealthy British-born businessman and Chief Executive Officer ("CEO") of the

10 Hakkasan Group. Upon information and belief, Moffitt acts as an agent and/or

11 intermediary in the United States for certain wealthy Arab investors, including

12 Khadem Al Qubaisi, Chairman of the Hakkasan Group.

13        17. Moffitt knew the quality of Palumbo and Papalian's work because

14 Moffitt had previously arranged for his principal (a wealthy Arab businessman whom

15 Moffitt referred to only as "His Excellency") to purchase another Palumbo / Papalian

16 project at 1201 Laurel Way, Beverly Hills, California 90210 ("Laurel Way"). Upon

17 information and belief, His Excellency is Khadem Al Qubaisi. Laurel Way was

18 purchased on or around February 5, 2014, for thirty-one million dollars ($31

19 million).

20        18. Laurel Way was designed and financed by Palumbo and Papalian and

21 built "on spec", *i.e.*, without a specific buyer. It was and is an immense

22 (approximately 11,000 square feet) and widely admired home with lavish features:

23 six bedrooms; 10 bathrooms; a master suite with bar; a deck and six-person jacuzzi

24 with fire feature; a screening room; a 1,000-bottle wine cellar; and a glass-walled,

25 six-car garage; among other features.

26        19. Moffitt was very impressed by Palumbo's work on Laurel Way and told

27 Palumbo "we like what you do" and "we want to be in the development business

28 with you." Moffitt told Palumbo that if he partnered with His Excellency, who has

104116.1

1  an estimated net worth of billions, Palumbo would "never need to look for money

2  again".

3      20.   Furthermore, Moffitt promised and represented to Palumbo that the

4  partnership would develop at least two other properties in the same calendar year if

5  Palumbo agreed to the deal. Palumbo was lured by the prospect of a multiple project

6  deal, considering that real estate in Los Angeles is entering into a hot cycle of six to

7  seven years. Taking stock of his future prospects, Palumbo realized that, at 55 years

8  old, this could be the best and last opportunity of his life to capitalize on a hot cycle.

9      21.   Moffitt proposed that both Palumbo and Papalian assign their rights to

10  purchase 1169 Hillcrest to a partnership to be formed with Moffitt in exchange for a

11  fifty-percent (50%) share in the profits of the sale of that property. Palumbo

12  proposed that Papalian remain a partner in the deal, but Moffitt opposed, saying "no

13  three-way orgies, we just want you."

14      22.   Palumbo was reticent at first to accept the proposal without Papalian and

15  discussed the offer with Papalian. Palumbo explained to Papalian that he [Palumbo]

16  had the opportunity to build out 1169 Hillcrest and design and develop several homes

17  simultaneously as part of the proposed partnership.

18      23.   Papalian was disappointed to be losing a lucrative investment opportunity

19  but did not want to stand in the way of a potentially better opportunity for Palumbo.

20  Papalian agreed to withdraw from the deal only upon the understanding that Palumbo

21  would be sharing in the profits on his development deal with Moffitt. That is

22  because, in exchange for Papalian's agreement to withdraw, Palumbo agreed to pay

23  Papalian five hundred thousand dollars ($500,000.00) on his [Palumbo's] expected

24  profits on the deal.

25      **D.  Palumbo and Moffitt Execute a Memorandum of Understanding With**

26          **Respect to Palumbo's Equity Participation in the 1169 Hillcrest Project**

27      24.   In or around March 2014, Palumbo and Moffitt executed a Memorandum

28  of Understanding (the "MOU") memorializing Palumbo's right to share in the profits

4

COMPLAINT

of the eventual sale of 1169 Hillcrest. A true and correct copy of the MOU is attached as **Exhibit "A"** and its terms are incorporated herein.

25.    In the MOU, Palumbo and Moffitt agreed that together they would form a limited liability company ("LLC") on or before March 17, 2014 to "own, construct, develop and sell an uber high end caliber home (the 'House') similar in scope to the residence located at 1201 Laurel Way . . . ."  Moffitt asked Palumbo numerous times what the costs of construction were for 1201 Laurel Way and Palumbo explained that building costs were over $1,000 per foot.

26.    Palumbo and Moffitt further agreed in the MOU that the LLC's operating agreement would provide for profit sharing between Moffitt and Palumbo as follows: "After payment in full of all amounts advanced by Moffitt, plus the 10% preferential return [up from a verbal agreement of 8%], all profits and losses of the LLC shall be split 40% to Palumbo [down from a verbal agreement of 50%] and 60% to Moffitt."

27.    The operating agreement was to further provide that "Palumbo's equity participation in the LLC will be full and complete compensation for all such services . . ." and that Palumbo would receive monthly draws, as an advance of Palumbo's share of profits, in the amount of fifteen thousand dollars ($15,000.00).  Palumbo further agreed to waive his standard five percent (5%) development fees in exchange for equity participation.

28.    In the MOU, and in exchange for the aforementioned profit-sharing arrangement, Palumbo agreed to assign all of his rights and interests in the purchase agreement for 1169 Hillcrest and related documents.  Palumbo would not have assigned all of his rights and interests in the purchase agreement for 1169 Hillcrest but for the profit-sharing arrangement

29.    Before the MOU was executed, and in reliance on the MOU and Moffitt's representations, Papalian, Palumbo and Moffitt executed a withdrawal and release whereby Papalian withdrew any of his interests in the purchase of 1169

104116.1

1  Hillcrest.  Palumbo and Papalian would not have withdrawn their interests in the

2  purchase of the Property but for Moffitt's representations.

3      **E.**  **Moffitt and Palumbo Execute the Development Services Agreement,**

4          **Under Which Palumbo Shares in Profits of the Sale of 1169 Hillcrest**

5      30.   On or around March 14, 2014, attorneys for Moffitt distributed a draft of

6  a "Development Services Agreement" to Palumbo's attorney.  Much to Palumbo's

7  surprise, that draft proposed the formation of an LLC to be controlled by Moffitt

8  alone, without Palumbo as a member.

9      31.   Concerned that Moffitt was attempting to change the material terms of

10  the deal, Palumbo sought assurances from Moffitt by email and by telephone.

11  Moffitt responded from Dubai, where, upon information and belief, Moffitt was

12  meeting with His Excellency to obtain His Excellency's approval of the deal.

13      32.   Citing "cultural reasons", *i.e.*, Arab culture, Moffitt claimed that it is

14  uncommon for individuals who do not know one another personally to enter into

15  formal partnership agreements.  Nevertheless, he reassured Palumbo that he (Moffitt)

16  and His Excellency would "honor their words" with respect to the partnership and

17  honor his 50% stake in the venture.  In Moffitt's words, "this is a very small deal and

18  we would never screw you out of a dollar."   Moffitt further repeated the

19  representation that if Palumbo agreed to work with Moffitt and His Excellency,

20  Palumbo would "never need to look for investors again."  Moffitt also reaffirmed that

21  together they would develop two other projects in the same calendar year.

22      33.   Consistent with the MOU, the Development Services Agreement

23  provides for profit-sharing by Palumbo in the form of an "Aggregate Development

24  Fee", which includes Palumbo's right to be paid "40% of the Net Profits on Sale of

25  the Project and/or Property [1169 Hillcrest]."

26      34.   Based on these representations and assurances, among others, Palumbo

27  executed the Development Services Agreement on March 20, 2014, a true and

28  correct copy of which is attached as **Exhibit "B"** and incorporated herein.  But for

6
COMPLAINT

104116.1

1   Moffitt's representations, Palumbo would not have executed the Development

2   Services Agreement.

3       35.   The new entity, 1169 Hillcrest LLC, was substituted in as the buyer for

4   the Property and escrow on 1169 Hillcrest closed shortly thereafter on March 24,

5   2014.

6   **F. Palumbo Performs As Required By and Under the Terms of the Parties'**

7       **Agreement and 1169 Hillcrest, LLC, Fails to Perform as Required**

8       36.   Immediately after the close of escrow, Palumbo began performing as

9   required under the terms of the Development Services Agreement.   Palumbo

10  arranged for the hiring of a world-class architect and top-tier consultants to design

11  and engineer a home intended to be one of the most sought-after spec homes in

12  Beverly Hills to date.

13      37.   Among other things, with this team Palumbo was able to design/engineer

14  a house over twenty-five thousand (25,000) square feet in size, which was needed to

15  compete with comparable homes on the market in the area and maximize profits.

16  Palumbo explained in detail to Moffitt that to make the "Proforma" work, the house

17  would need to be a <u>minimum</u> size of seventeen thousand (17,000) square feet, but

18  that twenty thousand (20,000) square feet plus was preferable.   It was always

19  understood that the project would need to be larger in scope, if achievable, to

20  maximize profits.

21      38.   Meanwhile, 1169 Hillcrest, LLC, was not performing as required under

22  the terms of the Development Services Agreement.   The LLC not only missed at

23  least five of the $15,0000 monthly draws owed to Palumbo, but also failed to pay or

24  underpaid several consultants and contractors brought onto the project by Palumbo.

25  The LLC's failure to pay or underpay these entities and individuals has damaged

26  Palumbo's reputation with them.

27      39.   Even more problematic, the LLC has failed to authorize the submission

28  of plan to the City of Beverly Hills, which threatens to devalue the project

104116.1

1    substantially.   Palumbo, together with the consultants, have been ready to submit

2    plans to the Beverly Hills Department of Building and Safety for a permit

3    application.  Such an application would increase the value of the project and preserve

4    entitlements that might be eliminated as a result of changes in zoning, codes or

5    Beverly Hills policies and practices.

6    **G. Moffitt Creates a Pretext for Reneging on Defendants' Deal with Moffitt**

7        **and Executes a Fraudulent Transfer of 1169 Hillcrest**

8        40.   In or around January 2015, Moffitt called Palumbo to report that His

9    Excellency was displeased with an incident that had allegedly occurred at 1201

10   Laurel Way.  Moffitt asserted that the brother of "His Excellency", a gentleman

11   named Darwish, had visited the property and, among other things, was unable to

12   obtain hot water and that he believed that there were certain defects with the property

13   that needed to be fixed.

14       41.   Palumbo responded that he had only designed the home and had no

15   control over or participation in the construction.   Nevertheless, he offered to

16   communicate His Excellency's concerns to the owner-builder of the property,

17   Papalian, who agreed to resolve the issues raised and, in fact, has done so.

18       42.   Upon information and belief, Moffitt's assertions regarding His

19   Excellency's alleged displeasure with 1201 Laurel Way were merely a pretext for

20   Moffitt's later attempt to deny Palumbo his share in the profits of an eventual sale of

21   1169 Hillcrest.

22       43.   On or around February 10, 2015, Moffitt emailed Palumbo, stating, in

23   relevant part, as follows:

24           Mike,

25           I trust this email finds you well? Further to our telephone conversation

26           and subsequent email I would like to clarify matters regarding 1169

27           Hillcrest.

28           As you know KAQ was very annoyed at the ongoing situation at

8
COMPLAINT

104116.1

1201 Laurel Way that he believes was designed and developed by yourself. As I shared with you, amongst the many things that are wrong with the property, on a recent visit from his brother there were many issues with the property not limited to a land slip and lack of water which led to a very embarrassing situation for both he and I when his brother returned to Abu Dhabi. Clearly this was not what was expected when purchasing a 31 Million Dollar property. . . .

...

Turning now to the Hillcrest development it has not gone as expected. When you first asked for the investment you proposed a budget in the 30 Million range which escalated to 42 Million primarily because of your design. In addition to this those involved have zero comfort in the fact that even if this was approved you could achieve this number as both our own advisors and the contractor believe the costs will increase further.

As I stated to you KAQ became so disenchanted by the combination of circumstances he no longer wanted his company to be involved in this project or with your future development efforts.

To avoid further embarrassment and annoyance, as well as to head off possible litigation, the Hillcrest Property was sold to an entity I control. Furthermore, I am evaluating options to propose to KAQ for the Laurel Property.

As you know under the terms of the Development Agreement, upon the sale of the property or the entity, the Development Agreement terminates.

The combination of payments to KAQ, potential payments to contractors, interest, accruals and the need to fund additional cash to maintain the property short-term could result in cash expenditures of

104116.1

1    approximately $ 19.4 million.

2          There are no funds to distribute to you or to anyone involved, other

3    than to repay KAQ's entity. . . .

4    44.   Upon receiving this email, Palumbo reached out to Moffitt for an

5 explanation as to how his [Palumbo's] interest in the eventual profits of 1169

6 Hillcrest could possibly be extinguished by Moffitt's alleged sale of the property to

7 himself.

8    45.   In response, Moffitt attempted to bully Palumbo into dropping any claim

9 to profits.  Without any mention of potential litigation by Palumbo, Moffitt warned

10 that "lawsuits are really hard and complex".  He further threatened that a lawsuit

11 would be "dirty, time-consuming and for somebody like Richard [Papalian] or a

12 general contractor or people that don't have a name it's okay.  But for a world-class

13 designer [Palumbo] it would be devastating to a reputation."

14    46.   Over the course of the next few weeks, Palumbo attempted to work out a

15 compromise, whereby Palumbo and a group of investors would purchase the property

16 from Moffitt for the alleged purchase price paid by Moffitt.  Palumbo and Papalian

17 desired to purchase the property back at cost so that they could continue to develop

18 and build the property that Palumbo had designed.

19    47.   In the end, Moffitt refused to entertain any offer by Palumbo to purchase

20 the property, including a firm offer of almost twenty-nine million dollars ($29

21 million) by a third party.  This further confirms Moffitt's and the LLC's fraudulent

22 intent to keep the property themselves, perhaps sell it at a later time for a profit and

23 continue to deny Palumbo and share in that profit.

24    **FIRST CAUSE OF ACTION**

25    **(Actual Fraudulent Transfer—Cal. Civ. Code § 3439.04)**

26    **(Against All Defendants)**

27    48.   Plaintiff repeats and incorporates herein Paragraphs 1 through 47,

28 inclusive, of its Complaint, as though fully set forth herein.

104116.1

49. On February 10, 2015, Moffitt unequivocally represented that the Property has been transferred to an entity under his control. As a manager, member or agent of 1169 Hillcrest, LLC, Moffitt is an insider and has failed to disclose the price paid for such transfer, which was made without notice to Plaintiff.

50. Plaintiff is informed and believes, and based thereon alleges, that defendants transferred the Property to another entity controlled by Moffitt (or so Moffitt claims) with the actual intent to hinder, delay or defraud Plaintiff from collecting the amounts owed to it, namely the profit sharing he was promised under the MOU and the Development Services Agreement.

51. Plaintiff is further informed and believes, and based thereon alleges, that 1169 Hillcrest, LLC (the vested owner of the Property) was insolvent on the date the asset was transferred, or became insolvent as a result of such transfer.

52. Plaintiff is further informed and believes, and based thereon alleges, that the transfer was made for the benefit of Moffitt, an insider, or for a group he controls and benefits from, and for the added purpose of avoiding the obligations under the Development Services Agreement.

53. Plaintiff is further informed and believes, and based thereon alleges, that the transfer was made without receiving reasonably equivalent value, and defendants knew or should have known that, subsequent to the transfer, 1169 Hillcrest LLC would have insufficient assets to pay its debts (including to Plaintiff).

54. By Moffitt's representation, the transfer was made by an insider, Neil Moffitt, to a company he controls. The transfer was concealed to Plaintiff until all the proceeds were allegedly gone and without any accounting.

55. Plaintiff's right to 40% of the profits from any sale of the Property arose before the sham transfer to Moffit's new entity.

56. Due to Moffitt's representation that no profits were achieved from such transfer, Plaintiff alleges on information and belief that the transfer to Moffitt's entity was made for no value changing hands, or for far less than reasonably equivalent

1    value or far below market value. In fact, the same person (Neil Moffitt) claims to

2    control the Property after the transfer.

3       57. Plaintiff alleges on information and belief that after the transfer of the

4    Property, 1169 Hillcrest, LLC has little or no assets left.

5       58. Plaintiff has been harmed by the fraudulent transfer. As a result of the

6    fraudulent transfer, the Property is (according to Moffitt's representations) now held

7    in an entity controlled by Moffitt, beyond the reach of Plaintiff, and is vulnerable to

8    further transfer or sale by Moffitt or the new entity.

9       59. As a result of the transfer, Plaintiff is entitled to all remedies against

10    defendants permitted under California Civil Code section 3439.07, including, without

11    limitation: a) avoidance of the transfer to the extent necessary to satisfy Plaintiff's

12    claim; b) attachment of other provisional remedy against the Property; c) injunctive

13    relief against further disposition by Moffitt or the transferee entity; d) appointment of

14    a receiver to take charge of the Property and the LLC and any proceeds; e) a written

15    accounting to Plaintiff of all the improperly transferred assets, and all profits and

16    proceeds garnered from such assets and any appraisal obtained; and f) all other relief

17    ordered by the Court.

18       60. The aforementioned conduct of Defendants was intentional and was done

19    with the intent of depriving Plaintiff of property rights and legal rights and causing

20    Plaintiff other injury. Defendants' conduct was despicable and subjected Plaintiff to

21    unjust hardship in conscious disregard of Plaintiffs' rights. As described herein,

22    Defendants conduct evinces malice, oppression or fraud and, accordingly, Plaintiff is

23    entitled to an award of punitive damages in an amount to be established at trial.

24                  **SECOND CAUSE OF ACTION**

25      **(Constructive Fraudulent Transfer—Cal. Civ. Code § 3439.05)**

26                  **(Against All Defendants)**

27       61. Plaintiff repeats and incorporates herein Paragraphs 1 through 60,

28    inclusive, of its Complaint, as though fully set forth herein.

COMPLAINT

104116.1

62.    Plaintiff is informed and believes, and based thereon alleges, that 1169 Hillcrest, LLC did not receive reasonably equivalent value in exchange for the transfer to Moffitt's entity, and 1169 Hillcrest, LLC was either insolvent at the time of the transfer, or rendered insolvent as a result of the transfer.

63.    Plaintiff has been harmed by the fraudulent transfer.  As a result of the fraudulent transfer, the Property is (according to Moffitt's representations) now held in an entity controlled by Moffitt, beyond the reach of Plaintiff, and is vulnerable to further transfer or sale by Moffitt or the new entity.

64.    As a result of the transfer, Plaintiff is entitled to all remedies against defendants permitted under California Civil Code section 3439.07, including, without limitation:  a) avoidance of the transfer to the extent necessary to satisfy Plaintiff's claim; b) attachment of other provisional remedy against the Property; c) injunctive relief against further disposition by Moffitt or the transferee entity; d) appointment of a receiver to take charge of the Property and the LLC and any proceeds; e) a written accounting to Plaintiff of all the improperly transferred assets, and all profits and proceeds garnered from such assets; and f) all other relief ordered by the Court.

## THIRD CAUSE OF ACTION

### (Promissory Fraud / Fraud in the Inducement)

### (Against All Defendants)

65.    Plaintiff repeats and incorporates herein Paragraphs 1 through 64, inclusive, of its Complaint, as though fully set forth herein.

66.    In or around February of 2014, Defendant Moffitt told Plaintiff Palumbo "we like what you do" and "we want to be in the development business with you." Moffitt promised and represented to Palumbo that if he [Palumbo] partnered with His Excellency, who has an estimated net worth of billions, Palumbo would "never need to look for money again".

67.    At the same time, Moffitt promised and represented to Palumbo that if he [Palumbo] entered into a deal to develop 1169 Hillcrest with Defendants, he

13

COMPLAINT

104116.1

1    [Palumbo] would share in the profits of a sale of 1169 Hillcrest and that Defendants

2    would work with Palumbo to develop at least two other properties in the same

3    calendar year..

4        68.    At the time Moffitt made the foregoing promises and representations, he

5    did so without any present intention of performing them and thereby made an

6    implied misrepresentation of fact.

7        69.    At the time Moffitt made the foregoing promises and representations, he

8    intended to deceive, defraud and induce Palumbo into relying on the promises and

9    representations.

10       70.    Palumbo reasonably relied on Moffitt's promises and representations and

11   assigned to Defendants his interests in 1169 Hillcrest and entered into the

12   Development Services Agreement.

13       71.    Moffitt's promises and representations were important factors in

14   Palumbo's decision to assign his interest in 1169 Hillcrest to Defendants and enter

15   into the Development Services Agreement.    But for Moffitt's promises and

16   representations, Palumbo would not have convinced Papalian to relinquish his

17   interest nor assigned to Defendants his interests in 1169 Hillcrest or entered into the

18   Development Services Agreement.

19       72.    As a direct and proximate result of Moffitt's conduct, Palumbo has been

20   harmed and damaged in an amount to be proven at trial, but believed to be no less

21   than fifteen million dollars ($15,000,000.00), based on the profits to be made on a

22   sale of the fully developed Property.

23       73.    The aforementioned conduct of Defendants was intentional and was done

24   with the intent of depriving Plaintiff of property rights and legal rights and causing

25   Plaintiff other injury.    Defendants' conduct was despicable and subjected Plaintiff to

26   unjust hardship in conscious disregard of Plaintiffs' rights.    As described herein,

27   Defendants conduct evinces malice, oppression or fraud and, accordingly, Plaintiff is

28   entitled to an award of punitive damages in an amount to be established at trial.

14
COMPLAINT

104116.1

# FOURTH CAUSE OF ACTION

## (Breach of Implied Covenant of Good Faith and Fair Dealing)

## (Against Defendant 1169 Hillcrest, LLC)

74.   Plaintiff repeats and incorporates herein Paragraphs 1 through 73, inclusive, of its Complaint, as though fully set forth herein.

75.   Plaintiff and Defendant 1169 Hillcrest, LLC, entered into the Development Services Agreement.  The Development Services Agreement, like all agreements, contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

76.   The Development Services Agreement provided Plaintiff 40% of the net profits of the sale of the Property.

77.   Plaintiff performed all or substantially all of his requirements and obligations to the Development Services Agreement, or was excused from performance.

78.   All conditions required for Defendant 1169 Hillcrest, LLC's performance had occurred or were excused.

79.   Defendant 1169 Hillcrest, LLC has breached the implied covenant of good faith and fair dealing and interfered with Plaintiff's right to receive the benefits of the contract by transferring the Property for less than fair market value, as described above, with the sole and specific purpose of depriving Plaintiff of his interest in the greater profits to be made at fair market value.

80.   As a direct and proximate result of Defendant's breach, Palumbo has been harmed and damaged in an amount to be proven at trial, but believed to be no less than fifteen million dollars ($15,000,000.00), based on the profits to be made on a sale of the fully developed Property.

///

///

104116.1

## FIFTH CAUSE OF ACTION

### (Unfair Competition Law—Cal. Bus. & Profs. Code section 17200)

### (Against all Defendants)

81.    Plaintiff repeats and incorporates herein Paragraphs 1 through 80, inclusive, of its Complaint, as though fully set forth herein.

82.    The acts and omissions of Defendants as set forth above constitute unfair competition and unfair business practices prohibited by Business and Professions Code section 17200, *et.seq.*, in that defendants' scheme a) first stripped Palumbo of his right to purchase the Property with his partner Papalian, and then b) evaded the contractual duties set forth in the MOU and the Development Services Agreement with a claim under pretext that the Property was sold and no profits were realized, in a transparent attempt to deprive Plaintiff of the benefit of his bargain and c) stripped 1169 Hillcrest, LLC of its most significant or sole asset, with insufficient funding to pay its obligations to creditors, including to Plaintiff.

83.    The misrepresentations and promises by Defendants induced Palumbo to enter into a deal with Defendants, and misled Palumbo and Papalian to giving up their original rights in this Property. These actions and misrepresentations show a conspiracy by Moffitt and 1169 Hillcrest, LLC to deprive Plaintiff of its rights to the Property and to profits from the Property and its development.

84.    Palumbo has been damaged as alleged above by the wrongful acts of Defendants constituting unfair competition under Business and Professions Code section 17200, *et.seq.*, in an amount according to proof at trial, but not less than fifteen million dollars ($15,000,000.00).

## SIXTH CAUSE OF ACTION

### (Constructive Trust)

85.    Plaintiff repeats and incorporates herein Paragraphs 1 through 84, inclusive, of its Complaint, as though fully set forth herein.

86.    As alleged above, the Property was to be developed and sold for a profit,

104116.1

1    of which, would be distributed according to the Development Services Agreement.

2        87.   As alleged above, Plaintiff has an interest in the profits from the sale of

3    the Property.

4        88.   As alleged above, Plaintiff is informed and believes, Defendants obtained

5    possession of the property by the alleged fraudulent transfer to deprive Plaintiff of

6    his interest.

7        89.   Plaintiff is entitled to, and requests, equitable relief in the form of an

8    order imposing a constructive trust, in favor of Plaintiff, on the Property acquired

9    from the wrongful conduct alleged above.

10    **SEVENTH CAUSE OF ACTION**

11    **(Accounting)**

12    **(Against all Defendants)**

13        90.   Plaintiff repeats and incorporates herein Paragraphs 1 through 89,

14    inclusive, of its Complaint, as though fully set forth herein.

15        91.   Palumbo has requested, and hereby reiterates his request for, an

16    accounting of all transactions concerning the Property, including any transfers or

17    encumbrances affecting the Property, and all inflows and expenditures and payments

18    before and after the alleged transfer to another entity controlled by Moffitt.

19        92.   Under the Development Services Agreement (sections 6.3 and 6.4),

20    Plaintiff is entitled to see the accounting and financial information and books and

21    records of 1169 Hillcrest, LLC but its requests have been ignored.

22        93.   Given the insider dealings between the LLC and Moffitt as alleged

23    herein, a full accounting should be ordered.

24    **PRAYER FOR RELIEF**

25    WHEREFORE, Plaintiff prays for judgment in its favor as follows:

26        1.  For all remedies against Defendants permitted under California Civil Code

27            section 3439.07, including, without limitation:

28            a.   avoidance of the transfer to the extent necessary to satisfy Plaintiff's

17

COMPLAINT

104116.1

claim;

    b.  attachment of other provisional remedy against the Property;

    c.  injunctive relief against further disposition by Moffitt or the transferee entity;

    d.  appointment of a receiver to take charge of the Property and the LLC and any proceeds;

    e.  a written accounting to Plaintiff of all the improperly transferred assets, and all profits and proceeds garnered from such assets; and

2.  For disgorgement of all sums of money received by Defendants as a result of their violation of section 17200 of the California Business and Professions Code;

3.  For rescission of the Development Services Agreement and return of the parties to the status quo prior to execution of that agreement;

4.  For compensatory damages and consequential damages according to proof at trial, but believed to be no fewer than fifteen million dollars ($15,000,000.00);

5.  For punitive damages according to proof at trial;

6.  For interest;

7.  For costs of suit and attorneys' fees;

8.  For such other and further relief as the Court may deem just, proper and appropriate.

DATED: March 13, 2015        **BROWN, NERI & SMITH LLP**

                        By:     _Geoffrey A. Neri_

                                Geoffrey A. Neri

COMPLAINT

104116.1

1

## <u>DEMAND FOR JURY TRIAL</u>

2        Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial

3 by jury of all issues so triable.

4

5 DATED:  March 13, 2015                 **BROWN, NERI & SMITH LLP**

6

7                                By:  _____

8                                      Geoffrey A. Neri

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

104116.1