GEOFFREY A. NERI (SBN 258802)
Geoff@bnslawgroup.com
ROWENNAKETE BARNES (SBN 302037)
kete@bnslawgroup.com
**BROWN, NERI & SMITH LLP**
11766 Wilshire Blvd., Suite 1670
Los Angeles, California 90025
Tel: (310) 593-9890
Fax: (310) 593-9980

Attorneys for Plaintiff
Palumbo Design, LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PALUMBO DESIGN, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>1169 HILLCREST, LLC, a Nevada limited liability company, NAM2 LLC, a Nevada limited liability company, NEIL A. MOFFITT, an individual, and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 2:15-cv-01899-DSF (VBKx)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) FRAUD IN THE INDUCEMENT/ RESCISSION;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(4) UNFAIR BUSINESS PRACTICES – BUS. & PROF. CODE SECTION 17200;**<br>**(5) CONSTRUCTIVE TRUST;**<br>**(6) ACCOUNTING**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Palumbo Design, LLC, for its First Amended Complaint against Defendants, and each of them, alleges as follows:

## INTRODUCTION

1. This case is about a lost opportunity of enormous magnitude, an opportunity that Plaintiff Palumbo Design, LLC ("Palumbo") would not have lost but for the breaches, duplicity and tortious misconduct of Defendants described herein.

2. Palumbo is a renowned home designer and developer who has been creating luxury homes in the so-called "Platinum Triangle" area of Los Angeles (the prestigious residential area of Los Angeles that encompasses Beverly Hills, Holmby Hills, and Bel Air), as well as the Hollywood Hills, for over thirty-five years.

3. In early 2014, Palumbo was on the verge of a career-defining moment. He and his business partner had entered into a purchase agreement of fifteen million ($15 million) for the purchase of a vacant parcel of land located at 1169 N. Hillcrest Road, Beverly Hills, California, 90210 ("1169 Hillcrest" or the "Property").

4. As the sales price suggests, 1169 Hillcrest is no ordinary parcel of land. It is perched on a promontory within the glamorous and highly-coveted Trousdale Estate neighborhood of Beverly Hills. Because of its location, 1169 Hillcrest has one of the most spectacular views in all of Los Angeles—a sweeping panoramic vista from Downtown Los Angeles to the shores of Malibu.

5. Palumbo intended to design and develop his "masterpiece" home at 1169 Hillcrest, a home befitting the view that would stand out among and rival even the most opulent homes in the area.

6. In the current, red-hot Los Angeles real estate market, Palumbo and his partner expected to make a substantial profit on the development. A neighboring home on the same street recently sold for the record-setting price of seventy million dollars ($70 million). Palumbo planned to develop a home at 1169 Hillcrest that would break that record, a home that could command a market price in excess of ninety million ($90 million).

7. Palumbo's plan to fulfill that ambition has been derailed by Defendants, who lured Palumbo into a "Development Services Agreement" that Defendants never planned to follow through with or honor. Shortly before Palumbo and his partner were about to close escrow on 1169 Hillcrest, Palumbo was approached by Defendant Neil Moffitt, who knew of Palumbo by reputation from Palumbo's design of another property for Mr. Moffitt's principal.

8. Moffitt was and is the principal for a fabulously wealthy and highly-secretive Arab businessman referred to only as "His Excellency." As described more fully herein, Palumbo had designed a property purchased by "His Excellency" through Moffitt. Moffitt subsequently approached Palumbo to propose that he (Palumbo) form a property development partnership with His Excellency and assign the purchase and sale agreement for 1169 Hillcrest to that partnership.

9. Moffitt told Palumbo "we like what you do" and "we want to be in the development business with you." Moffitt told Palumbo that if he partnered with His Excellency, who upon information and belief has an estimated net worth of billions, Palumbo would "never need to look for money again" for his development projects.

10. Furthermore, Moffitt promised and represented to Palumbo that the partnership would develop at least two other properties in the same calendar year if Palumbo agreed to the deal.

11. Palumbo was lured by the prospect of a multiple project deal, considering that real estate in Los Angeles is entering into a hot cycle of six to seven years. Taking stock of his future prospects, Palumbo realized that, at 55 years old, this could be the best and last opportunity of his life to capitalize on a hot cycle.

12. Pursuant to a "Development Services Agreement" executed by and between Palumbo and Defendant 1169 Hillcrest, LLC, Palumbo assigned the rights to purchase and develop 1169 Hillcrest, in exchange for forty percent (40%) of the net profits on the eventual sale of the developed Property.

13. Much to Palumbo's dismay, less than a year later, Defendants reneged

on their promises and abandoned the development project in its nascent stage. Rather than "develop" the Property, which was the ***entire purpose*** of the parties' *Development* Services Agreement, Defendants created a pretext to "flip" the Property, *i.e.*, quickly sell it at an under-market price in order to make a quick buck.

14. Without Palumbo's knowledge or participation, Defendants purported to enter into a purchase and sale agreement with a wealthy investor named Alex Soltani, who had previously approached Palumbo to do business.

15. By and through this action, Palumbo seeks a rescission of the Development Services Agreement and related assignment agreements referred to therein, pursuant to which Palumbo gave up its substantial rights and interest in the purchase of 1169 Hillcrest. Palumbo and his partner would not have assigned their rights and interest in 1169 Hillcrest but for the misrepresentations, lies and concealment of Defendants, as described more fully herein, and Palumbo would not have lost the opportunity of a lifetime. Palumbo also requests equitable relief in the form of an order imposing a constructive trust, in favor of Palumbo, on the Property acquired, 1169 Hillcrest, from the wrongful conduct alleged above and herein.

16. In the alternative, Palumbo seeks to recover damages and the lost profits resulting from Defendants' breaches of their agreements and obligations, including breach of contract and the implied covenant of good faith and fair dealing. Palumbo's damages are ongoing and will be proven at trial, but are believed to be no less than fifteen million dollars ($15,000,000.00) as of the date of this filing.

## PARTIES

17. Plaintiff Palumbo Design, LLC, is a limited liability company organized and existing pursuant to the laws of the State of California. Its only officers and members are Michael Palumbo and his wife Lindsey Kelley, both of whom are residents and citizens of California.

18. Defendant 1169 Hillcrest, LLC, is a limited liability company organized and existing pursuant to the laws of the State of Nevada. Its only member is NAM2

LLC, another limited liability company organized and existing pursuant to the laws of the State of Nevada.

19. Defendant NAM2 LLC is a limited liability company organized and existing pursuant to the laws of the State of Nevada. Upon information and belief, its only member. Upon information and belief, NAM2 LLC is named after the initials of its only member, Neil A. Moffitt.

20. Upon information and belief, Defendant Neil A. Moffitt, is an individual resident and citizen of the State of Nevada.

21. Plaintiff is informed and believes and thereon alleges that NAM2 LLC is the alter ego of 1169 Hillcrest LLC and Defendant Neil A. Moffitt is the alter ego of NAM2 LLC, and there exists such unity of interest and ownership between and among them such that any individuality and separateness has ceased to exist. Plaintiff is informed and believes and thereon alleges that Moffitt controls NAM2 LLC and NAM2 LLC controls 1169 Hillcrest LLC, to such a degree as to render them mere instrumentalities, agencies or conduits. Accordingly, adherence to the fiction of separate corporate existence of NAM2 LLC and 1169 Hillcrest would permit abuse of the corporate form and promote and sanction fraud and injustice.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy is greater than $75,000.

23. Venue is proper in this district under 28 U.S.C. § 1391 as a substantial part of the acts or omissions giving rise to the claims described herein occurred in this district and the property that is the subject of the action is situated in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Palumbo Locks In an Investment Opportunity in 1169 Hillcrest

24. Palumbo is one of Southern California's premier luxury home designers and has garnered numerous accolades as the designer of some of the most

distinctive, high-end homes in the Los Angeles area. Palumbo's principal is Michael Palumbo, whose career spans almost 35 years.

25. Mr. Palumbo has designed and completed numerous high-profile custom homes in the exclusive "Platinum Triangle" area of Beverly Hills, Bel Air and the Hollywood Hills, and he enjoys an excellent reputation in the Southern California design and development community.

26. Richard Papalian ("Papalian") is a successful real estate investor. Palumbo and Papalian have worked together on two real estate design and development projects in the past, namely 1201 Laurel Way, Beverly Hills, 90210 and 749 Cloverdale Avenue, Los Angeles, 90036.

27. In or around January of 2014, Palumbo identified a lucrative investment opportunity in a parcel of real property located at 1169 N. Hillcrest Road, Beverly Hills, California, 90210 ("1169 Hillcrest" or the "Property").

28. Palumbo intended to design, as well as assemble a team to build, a unique, signature project at 1169 Hillcrest. Palumbo projected that he could design a house at 1169 Hillcrest with a minimum size of 17,000 square feet, at an estimated cost of seventeen million dollars ($17 million) and an estimated sale price of forty-five million dollars ($45 million). Palumbo believed, however, that it would be possible to develop an even bigger house that would sell for as much as ninety million dollars ($90 million).

29. Palumbo knew that such a result was attainable based, in part, on his knowledge of other properties in the immediate area (in fact, on the same street) that had sold or would be on the market to be sold for seventy to ninety-five million dollars ($70-$95 million). Palumbo told Papalian of the enormous profit potential and Papalian agreed to finance a purchase of the Property and work together with Palumbo on its development.

30. While the owners of the Property were reluctant to sell, Palumbo eventually negotiated a sale price of sixteen million ($16 million) for the Property.

Papalian further negotiated a reduction in the price to fifteen million ($15 million).

**B. <u>Palumbo and Papalian Enter Into Escrow on 1169 Hillcrest</u>**

31. On or around February 13, 2014, Palumbo and Papalian signed a purchase agreement to purchase the Property for fifteen million dollars ($15 million), all cash.

32. On or around February 19, 2014, Palumbo and Papalian opened escrow and deposited four hundred and fifty thousand dollars ($450,000.00). By this time, they had answered their due diligence questions and fully secured the opportunity to develop the Property as identified and envisioned by Palumbo.

**C. <u>Moffitt Induces Palumbo to Enter Into a Development Deal</u>**

33. Before the close of escrow, however, Palumbo was approached by Defendant Neil Moffitt ("Moffitt"), who wanted to get into the deal. Moffitt is a wealthy British-born businessman and Chief Executive Officer ("CEO") of the Hakkasan Group. Upon information and belief, Moffitt acts as an agent and/or intermediary in the United States for certain wealthy Arab investors, including Khadem Al Qubaisi, Chairman of the Hakkasan Group.

34. Moffitt knew the quality of Palumbo and Papalian's work because Moffitt had previously arranged for his principal (a wealthy Arab businessman whom Moffitt referred to only as "His Excellency") to purchase another Palumbo / Papalian project at 1201 Laurel Way, Beverly Hills, California 90210 ("Laurel Way"). Upon information and belief, His Excellency is Khadem Al Qubaisi. Laurel Way was purchased on or around February 5, 2014, for approximately thirty-one million dollars ($31 million).

35. Laurel Way was designed and financed by Palumbo and Papalian and built "on spec", *i.e.*, without a specific buyer. It was and is an immense (approximately 11,000 square feet) and widely admired home with lavish features: six bedrooms; 10 bathrooms; a master suite with bar; a deck and six-person jacuzzi with fire feature; a screening room; a 1,000-bottle wine cellar; and a glass-walled,

six-car garage; among other features.

36. Moffitt was very impressed by Palumbo's work on Laurel Way and told Palumbo "we like what you do" and "we want to be in the development business with you." Moffitt told Palumbo that if he partnered with His Excellency, who has an estimated net worth of billions, Palumbo would "never need to look for money again".

37. Furthermore, Moffitt promised and represented to Palumbo that the partnership would develop at least two other properties in the same calendar year if Palumbo agreed to the deal.

38. Palumbo was lured by the prospect of a multiple project deal, considering that real estate in Los Angeles is entering into a hot cycle of six to seven years. Taking stock of his future prospects, Palumbo realized that, at 55 years old, this could be the best and last opportunity of his life to capitalize on a hot cycle.

39. Moffitt proposed that both Palumbo and Papalian assign their rights to purchase 1169 Hillcrest to a partnership to be formed with Moffitt in exchange for a fifty-percent (50%) share in the profits of the sale of that property.

40. Palumbo proposed that Papalian remain a partner in the deal, but Moffitt opposed, saying "no three-way orgies, we just want you."

41. Palumbo was reticent at first to accept the proposal without Papalian and discussed the offer with Papalian. Palumbo explained to Papalian that he [Palumbo] had the opportunity to build out 1169 Hillcrest and design and develop several homes simultaneously as part of the proposed partnership.

42. Papalian was disappointed to be losing a lucrative investment opportunity but did not want to stand in the way of a potentially better opportunity for Palumbo. Papalian agreed to withdraw from the deal only upon the understanding that Palumbo would be sharing in the profits on his development deal with Moffitt. That is because, in exchange for Papalian's agreement to withdraw, Palumbo agreed to pay Papalian five hundred thousand dollars ($500,000.00) on his

[Palumbo's] expected profits on the deal.

**D. Palumbo and Moffitt Execute a Memorandum of Understanding With Respect to Palumbo's Equity Participation in the 1169 Hillcrest Project**

43. In or around March 2014, Palumbo and Moffitt executed a Memorandum of Understanding (the "MOU") memorializing Palumbo's right to share in the profits of the eventual sale of 1169 Hillcrest. A true and correct copy of the MOU is attached as **Exhibit "A"** and its terms are incorporated herein.

44. In the MOU, Palumbo and Moffitt agreed that together they would form a limited liability company ("LLC") on or before March 17, 2014 to "own, construct, ***develop*** and sell an uber high end caliber home (the 'House") similar in scope to the residence located at 1201 Laurel Way . . . ." (MOU at p. 1 of 5) (emphasis added). Moffitt asked Palumbo numerous times what the costs of construction were for 1201 Laurel Way and Palumbo explained that building costs were over $1,000 per foot.

45. Palumbo and Moffitt further agreed in the MOU that the LLC's operating agreement would provide for profit sharing between Moffitt and Palumbo as follows: "After payment in full of all amounts advanced by Moffitt, plus the 10% preferential return [up from a verbal agreement of 8%], all profits and losses of the LLC shall be split 40% to Palumbo [down from a verbal agreement of 50%] and 60% to Moffitt." (MOU at p. 2 of 5).

46. The operating agreement was to further provide that "Palumbo's equity participation in the LLC will be full and complete compensation for all such services . . ." and that Palumbo would receive monthly draws, as an advance of Palumbo's share of profits, in the amount of fifteen thousand dollars ($15,000.00). Palumbo further agreed to waive his standard five percent (5%) development fees in exchange for equity participation. (*Id.*)

47. In the MOU, and in exchange for the aforementioned profit-sharing arrangement, Palumbo agreed to assign all of his rights and interests in the purchase

agreement for 1169 Hillcrest and related documents. Palumbo would not have agreed to assign all of his rights and interests in the purchase agreement for 1169 Hillcrest but for the profit-sharing arrangement and Defendants' representations that this parties would actually be ***developing*** the property, as recited in and contemplated in the MOU and subsequent documents, for the substantial profits Palumbo had projected.

48. Before the MOU was executed, and in reliance on the MOU and Moffitt's representations, Papalian, Palumbo and Moffitt executed a withdrawal and release whereby Papalian withdrew any of his interests in the purchase of 1169 Hillcrest. Palumbo and Papalian would not have agreed to withdraw their interests in the purchase of the Property but for Defendants' promises and representations, as described herein.

**E. Moffitt and Palumbo Execute the Development Services Agreement, Under Which Palumbo Shares in Profits of the Sale of 1169 Hillcrest**

49. On or around March 14, 2014, attorneys for Moffitt distributed a draft of a "Development Services Agreement" to Palumbo's attorney. Much to Palumbo's surprise, that draft proposed the formation of an LLC to be controlled by Moffitt alone, without Palumbo as a member.

50. Concerned that Moffitt was attempting to change the material terms of the deal, Palumbo sought assurances from Moffitt by email and by telephone. Moffitt responded from Dubai, where, upon information and belief, Moffitt was meeting with His Excellency to obtain His Excellency's approval of the deal.

51. Citing "cultural reasons", *i.e.*, Arab culture, Moffitt claimed that it is uncommon for individuals who do not know one another personally to enter into formal partnership agreements. Moffitt further represented that the money for the investment would flow through several countries and an intricate web of corporate entities, for tax and other purposes, and that Palumbo would "want no part of that."

52. Nevertheless, Moffitt reassured Palumbo that he (Moffitt) and His

Excellency would "honor their words" with respect to the partnership and honor his 50% stake in the venture. In Moffitt's words, "this is a very small deal and we would never screw you out of a dollar."

53. Moffitt further repeated the representation that if Palumbo agreed to work with Moffitt and His Excellency, Palumbo would "never need to look for investors again." Moffitt also reaffirmed that together they would develop two other projects in the same calendar year.

54. Moffitt's representation that the LLC and Palumbo would develop at least two other projects together was the representation that ultimately closed the deal for Palumbo, as Palumbo was interested in long-term-development, not simply buying and "flipping" properties for s short-term gain.

55. Consistent with the MOU, the final draft of the Development Services Agreement, a true and correct copy of which is attached hereto as **<u>Exhibit "B"</u>**, recites that the purpose of the agreement is to "purchase and own and upon purchase ***will develop***" 1169 Hillcrest. (Development Services Agreement at p. 1 of 20).

56. The Development Services Agreement further provides for profit-sharing by Palumbo in the form of an "Aggregate Development Fee", which includes Palumbo's right to be paid "40% of the Net Profits on Sale of the Project and/or Property [1169 Hillcrest]." (*Id.* at Schedule 5.1.)

57. Based on Defendants' promises, representations and assurances, described herein, Palumbo executed the Development Services Agreement on March 20, 2014. But for Defendants' promises and representations, Palumbo <u>would not</u> have executed the Development Services Agreement and therein assign his rights and interests in 1169 Hillcrest to 1169 Hillcrest LLC. Nor would Papalian have agreed to assign his rights and interests.

58. The new entity, 1169 Hillcrest LLC, was substituted in as the buyer for the Property, in place of Palumbo and Papalian, and escrow on 1169 Hillcrest closed shortly thereafter on March 24, 2014.

### F. Palumbo Performs As Required By and Under the Terms of the Parties' Agreement and 1169 Hillcrest, LLC, Fails to Perform as Required

59. Immediately after the close of escrow, Palumbo began performing as required under the terms of the Development Services Agreement. Palumbo arranged for the hiring of a world-class architect and top-tier consultants to design and engineer a home intended to be one of the most sought-after spec homes in Beverly Hills to date.

60. Among other things, with this team Palumbo was able to design/engineer a house over twenty-five thousand (25,000) square feet in size, which was needed to compete with comparable homes on the market in the area and maximize profits.

61. Palumbo explained in detail to Moffitt that to make the "Proforma" work, the house would need to be a minimum size of seventeen thousand (17,000) square feet, but that twenty thousand (20,000) square feet plus was preferable. It was always understood that the project would need to be larger in scope, if achievable, to maximize profits.

62. Meanwhile, 1169 Hillcrest, LLC breached the Development Services Agreement by missing at least five of the $15,000 monthly draws owed to Palumbo. It also failed to pay or underpaid several consultants and contractors brought onto the project by Palumbo, thus damaging Palumbo's reputation with them.

63. Even more problematic, the LLC has failed to authorize the submission of plan to the City of Beverly Hills, which has devalued the project substantially.

64. Palumbo, together with the consultants, have been ready to submit plans to the Beverly Hills Department of Building and Safety for a permit application. Such an application would increase the value of the project and preserve entitlements that might be eliminated as a result of changes in zoning, codes or Beverly Hills policies and practices.

65. As recently as May 2015, Palumbo was informed by a prospective buyer

of the property that the buyer would pay an additional $3 million for the property with permits.

**G. Moffitt Creates a Pretext for Reneging on Defendants' Deal with Moffitt and Purports to Have Executed a Fraudulent Transfer of 1169 Hillcrest**

66. In or around January 2015, Moffitt called Palumbo to report that His Excellency was displeased with an incident that had allegedly occurred at 1201 Laurel Way. Moffitt asserted that the brother of "His Excellency", a gentleman named Darwish, had visited the property and, among other things, was unable to obtain hot water and that he believed that there were certain defects with the property that needed to be fixed.

67. Palumbo responded that he had only designed the home and had no control over or participation in the construction. Nevertheless, he offered to communicate His Excellency's concerns to the owner-builder of the property, Papalian, who agreed to resolve the issues raised and, in fact, has done so.

68. Moffitt's assertions regarding His Excellency's alleged displeasure with 1201 Laurel Way were merely a pretext for Moffitt's later attempt to deny Palumbo his share in the profits of an eventual sale of 1169 Hillcrest.

69. On or around February 10, 2015, Moffitt emailed Palumbo, stating, in relevant part, as follows:

> Mike,
>
> I trust this email finds you well? Further to our telephone conversation and subsequent email I would like to clarify matters regarding 1169 Hillcrest.
>
> As you know KAQ was very annoyed at the ongoing situation at 1201 Laurel Way that he believes was designed and developed by yourself. As I shared with you, amongst the many things that are wrong with the property, on a recent visit from his brother there were many issues with the property not limited to a land slip and lack of water which

led to a very embarrassing situation for both he and I when his brother returned to Abu Dhabi. Clearly this was not what was expected when purchasing a 31 Million Dollar property. . . .

…

Turning now to the Hillcrest development it has not gone as expected. When you first asked for the investment you proposed a budget in the 30 Million range which escalated to 42 Million primarily because of your design. In addition to this those involved have zero comfort in the fact that even if this was approved you could achieve this number as both our own advisors and the contractor believe the costs will increase further.

As I stated to you KAQ became so disenchanted by the combination of circumstances he no longer wanted his company to be involved in this project or with your future development efforts.

To avoid further embarrassment and annoyance, as well as to head off possible litigation, the Hillcrest Property was sold to an entity I control. Furthermore, I am evaluating options to propose to KAQ for the Laurel Property.

As you know under the terms of the Development Agreement, upon the sale of the property or the entity, the Development Agreement terminates.

The combination of payments to KAQ, potential payments to contractors, interest, accruals and the need to fund additional cash to maintain the property short-term could result in cash expenditures of approximately $ 19.4 million.

There are no funds to distribute to you or to anyone involved, other than to repay KAQ's entity. . . .

70. Upon receiving this email, Palumbo reached out to Moffitt for an

explanation as to how his [Palumbo's] interest in the eventual profits of 1169 Hillcrest could possibly be extinguished by Moffitt's alleged sale of the property to himself.

71. In response, Moffitt attempted to bully Palumbo into dropping any claim to profits. Without any mention of potential litigation by Palumbo, Moffitt warned that "lawsuits are really hard and complex". He further threatened that a lawsuit would be "dirty, time-consuming and for somebody like Richard [Papalian] or a general contractor or people that don't have a name it's okay. But for a world-class designer [Palumbo] it would be devastating to a reputation."

72. Over the course of the next few weeks, Palumbo attempted to work out a compromise, whereby Palumbo and a group of investors would purchase the property from Moffitt for the alleged purchase price paid by Moffitt. Palumbo and Papalian desired to purchase the property back at cost so that they could continue to develop and build the property that Palumbo had designed.

73. Moffitt refused, however, and Palumbo only discovered after the fact that Defendants had been negotiating for a sale to a third-party, Alex Soltani and a limited liability company that he controls called Skyview Capital, LLC ("Skyview").

74. The Complaint filed in *Skyview Capital, LLC v. 1169 Hillcrest, LLC et al.*, Case No. 2:15-cv-02321-MRP-VBK (C.D. Cal., filed March 27, 2015), alleges that Moffitt agreed to sell the Property to him for $22,180,000, resulting in a profit of approximately $6 million, which is substantially less than the $15 million in profits that Palumbo and the LLC projected under their long-term development plans.

75. Defendants attempted sale of the Property for substantially less than it is worth when fully developed, further confirms that Defendants never had and have no interest in developing the Property, as represented and agreed in the *Development* Services Agreement. Rather, their fraudulent intent, from the very beginning of their business relationship with Palumbo, was to acquire the Property for themselves and "flip it", *i.e.*, sell it for a quick profit, rather than actually develop it.

**FIRST CAUSE OF ACTION**

**(Fraud in the Inducement / Rescission)**

**(Against All Defendants)**

76. Plaintiff repeats and incorporates herein Paragraphs 1 through 75, inclusive, of its Complaint, as though fully set forth herein.

77. In or around February of 2014, Defendant Moffitt told Plaintiff Palumbo "we like what you do" and "we want to be in the development business with you." Moffitt promised and represented to Palumbo that if he [Palumbo] partnered with His Excellency, who has an estimated net worth of billions, Palumbo would "never need to look for money again".

78. Moffitt promised and represented to Palumbo that the proposed partnership would ***develop*** the Property in the large scale and high design that they had discussed and that Palumbo would share in the profits of a sale of 1169 Hillcrest, after it had been developed. He also promised that Defendants would work with Palumbo to develop at least two other properties in the same calendar year.

79. At the time Moffitt made the foregoing promises and representations, he did so without any present intention of performing them and thereby made an implied misrepresentation of fact. At the time Moffitt made these promises and representations, Defendants did not intend to ***develop*** the property, but rather to acquire Palumbo's and his partner's rights and interests in the purchase, so that Defendants could make a quick buck on a "flip" of the Property, *i.e.*, a quick sale of the Property in an undeveloped and unpermitted form.

80. At the time Moffitt made the foregoing promises and representations, he intended to deceive, defraud and induce Palumbo into relying on the promises and representations and in order to induce him into partnering with Defendants and give up his rights to purchase and develop the Property.

81. Palumbo reasonably relied on Moffitt's promises and representations and assigned to Defendants his interests in 1169 Hillcrest, pursuant to Section 10.2 of the

Development Services Agreement ("Assignment of Property Documents").

82. Moffitt's promises and representations were key factors in Palumbo's decision to assign his interest in 1169 Hillcrest to Defendants and enter into the Development Services Agreement. But for Moffitt's promises and representations, Palumbo would not have relinquished nor assigned its rights and interests in the purchase of 1169 Hillcrest or entered into the Development Services Agreement.

83. Other misrepresentations made by Moffitt in order to conceal Defendants' fraudulent scheme to sell the property (rather than develop it) to a third party, and thereby forestall Palumbo from taking legal action until the Property was already clandestinely sold, include the following:

(a) Misrepresentations by Moffitt that he was going to keep the Property for his son. Moffitt misrepresented that he had put the Property in a special tax trust for his son and so he [Moffitt] could not sell it;

(b) Misrepresentations by Moffitt that he was arranging a meeting between Palumbo and His Excellency to discuss a potential resolution, a meeting which never happened;

(c) Misrepresentations by Moffitt that he was willing to sell the Property to Palumbo if Palumbo could obtain $24 million for the purchase within 48 hours;

(d) Misrepresentations as described above that the LLC had transferred the property to another entity controlled by Moffitt for zero profit, when in fact Moffitt was actually negotiating to sell the Property to Alex Soltani and Skyview Capital, LLC.

84. These misrepresentations and the others previously described reveal Defendants' fraudulent intent. There was never any intention by Defendants to develop the Property or share profits with Palumbo at all–Defendants' promises were made solely to induce Palumbo into assigning its rights and interests to purchase and develop 1169 Hillcrest.

85. Plaintiff intends this First Amended Complaint to serve as notice of rescission of the aforementioned Development Services Agreement and related assignments and hereby requests a restoration of the status quo before Palumbo relinquished his rights in the Property.

86. As a direct and proximate result of Defendants' conduct, Palumbo has been harmed and damaged in an amount to be proven at trial, but believed to be no less than fifteen million dollars ($15,000,000.00), based on the profits to be made on a sale of the fully developed Property. In the alternative to his request for rescission, Palumbo seeks a recovery of those damages.

87. The aforementioned conduct of Defendants was intentional and was done with the intent of depriving Plaintiff of property rights and legal rights and causing Plaintiff other injury. Defendants' conduct was despicable and subjected Plaintiff to unjust hardship in conscious disregard of Plaintiff's rights. As described herein, Defendants' conduct evinces malice, oppression or fraud and, accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be established at trial.

**SECOND CAUSE OF ACTION**

**(Breach of Contract)**

**(Against Defendant 1169 Hillcrest LLC)**

88. Plaintiff repeats and incorporates herein Paragraphs 1 through 87, inclusive, of its Complaint, as though fully set forth herein.

89. 1169 Hillcrest LLC breached the Development Services Agreement by failing to cooperate with Palumbo in long-term development of the property, as agreed to in the Development Services Agreement, and instead selling the property in an undeveloped and unpermitted state for a short-term profit which is substantially less than the profit that would have been realized at a sale of the developed property.

90. The very purpose and goal of the parties' agreement was to maximize the sale price of the Property after developing a high end, luxury, one-of-a- kind project – indeed, this was the very reason Palumbo agreed to go into business with

Defendants and give up its rights and interest in the purchase of the Property.

91. 1169 Hillcrest LLC further breached the Development Services Agreement by:

a. Failing to pay at least 5 draws of $15,000 each pursuant to Schedule 5.1 of the Development Services Agreement;

b. Failing to submit building plans to the City of Beverly Hills which would have entitled the Property, increased its value, and secured necessary entitlements before any changes occurred to the zoning, codes or building restrictions in the area;

c. Failing to provide an accounting;

d. Repudiating the Agreement on February 10, 2015, with a claim that the Property was transferred to another entity in Moffitt's control, in an attempt to cut off Plaintiff's rights to profits from a sale at a much higher price after development, and refusing to disclose the price or profits of such transfer.

92. Palumbo has been damaged by the foregoing breaches, as follows:

a. At least 5 draws of $15,000 per month;

b. its rightful share to 40% of the profits from any sale of the developed Property;

c. loss of the substantially higher profits Palumbo would have achieved if the Property would have been sold after the plans had been submitted, approved and the Property developed, in an amount according to proof but which plaintiff estimates at $15 million or more.

## THIRD CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**(Against Defendant 1169 Hillcrest LLC)**

93. Plaintiff repeats and incorporates herein Paragraphs 1 through 92, inclusive, of its Complaint, as though fully set forth herein.

94. Plaintiff and Defendant 1169 Hillcrest, LLC, entered into the

Development Services Agreement. The Development Services Agreement, like all agreements, contain an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.

95. The Development Services Agreement contemplates and requires the parties to treat one another in good faith and fairly in a joint "development" of the Property, in order that both parties may realize the full benefits of the agreement. Specifically, the Development Services Agreement required both parties to cooperate in good faith so that Defendant could receive approximately 60% and Plaintiff would receive approximately 40% of the net profits of the sale of the ***developed*** Property.

96. Plaintiff performed all or substantially all of his requirements and obligations to the Development Services Agreement, or was excused from performance.

97. All conditions required for Defendant 1169 Hillcrest, LLC's performance had occurred or were excused.

98. Defendant 1169 Hillcrest, LLC has breached the implied covenant of good faith and fair dealing and interfered with Plaintiff's right to receive the benefits of the contract by repudiating its agreement to develop 1169 Hillcrest LLC and instead arranging a clandestine sale of the Property to Alex Soltani and Skyview Capital, LLC, without any notice to or input by Palumbo.

99. Defendant has further breached the implied covenant of good faith and fair dealing by failing to cooperate with Palumbo in maintenance of the Property and failing to cooperate with Palumbo in obtaining valuable permits for the Property, resulting in a substantial dimunition in the value of the Property.

100. The sale of the Property, if consummated, will be at a sale price that is at least $6 million less than the current market value of the Property, as demonstrated by a contemporaneous offer for the Property, and at least $9 million less than the market value of the Property if it were permitted.

101. As a direct and proximate result of Defendant's breach, Palumbo has been harmed and damaged in an amount to be proven at trial, but believed to be no less than fifteen million dollars ($15,000,000.00), based on the profits to be made on a sale of the fully developed Property.

**FOURTH CAUSE OF ACTION**

**(Unfair Competition Law—Cal. Bus. & Profs. Code section 17200)**

**(Against all Defendants)**

102. Plaintiff repeats and incorporates herein Paragraphs 1 through 101, inclusive, of its Complaint, as though fully set forth herein.

103. The acts and omissions of Defendants as set forth above constitute unfair competition and unfair business practices prohibited by Business and Professions Code section 17200, *et.seq*., in that defendants' scheme a) first stripped Palumbo of his right to purchase the Property with his partner Papalian, and then b) evaded the contractual duties set forth in the MOU and the Development Services Agreement with a claim under pretext that the Property was sold and no profits were realized, in a transparent attempt to deprive Plaintiff of the benefit of his bargain.

104. The misrepresentations and promises by Defendants induced Palumbo to enter into a deal with Defendants, and misled Palumbo and Papalian to giving up their original rights in this Property. These actions and misrepresentations show a conspiracy by Moffitt and 1169 Hillcrest, LLC to deprive Plaintiff of its rights to the Property and to profits from the Property and its development.

105. Palumbo has been damaged as alleged above by the wrongful acts of Defendants constituting unfair competition under Business and Professions Code section 17200, *et.seq*., in an amount according to proof at trial, but not less than fifteen million dollars ($15,000,000.00).

/ / /

/ / /

/ / /

**FIFTH CAUSE OF ACTION**

**(Constructive Trust)**

**(Against All Defendants)**

106. Plaintiff repeats and incorporates herein Paragraphs 1 through 105, inclusive, of its Complaint, as though fully set forth herein.

107. As alleged above, Palumbo only agreed to give up his rights and interest in a purchase of the Property as a result of Defendants' promises and fraudulent representations described herein, which include the promises and fraudulent representations that the parties would develop the Property together and that the sale of the Property would be a sale of the developed and permitted Property, not a short-term "flip" to a third-party investor.

108. By reason of the fraudulent and otherwise wrongful manner in which the Defendants, or each and any of them, obtained their alleged right, claim or interest in the Property, Defendants, or each and any of them, are involuntary trustees holding the Property and profits to be obtained in constructive trust for Plaintiff, with the duty to convey the same to Plaintiff.

109. Plaintiff is entitled to, and requests, equitable relief in the form of an order imposing a constructive trust, in favor of Plaintiff, on the Property acquired from the wrongful conduct alleged above.

**SIXTH CAUSE OF ACTION**

**(Accounting – Against All Defendants)**

110. Plaintiff repeats and incorporates herein Paragraphs 1 through 109, inclusive, of its Complaint, as though fully set forth herein.

111. Palumbo has requested, and hereby reiterates his request for, an accounting of all transactions concerning the Property, including any transfers or encumbrances affecting the Property, and all inflows and expenditures and payments before and after any alleged transfer by Moffitt.

112. Under the Development Services Agreement (sections 6.3 and 6.4),

Plaintiff is entitled to see the accounting and financial information and books and records of 1169 Hillcrest, LLC but its requests have been ignored.

113. Given the insider and concealed transactions and other dealings between the LLC and Moffitt as alleged herein, a full accounting should be ordered.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor as follows:

1. For rescission of the Development Services Agreement and return of the parties to the status quo prior to execution of that agreement;
2. For imposition of a constructive trust over the Property;
3. For compensatory damages and consequential damages according to proof at trial, but believed to be no fewer than fifteen million dollars;
4. For disgorgement of all sums of money received by Defendants as a result of their violation of section 17200 of the Business and Professions Code;
5. For punitive damages according to proof at trial;
6. For interest, costs of suit and any attorneys' fees provided for by law; and
7. For such other relief as the Court may deem just, proper and appropriate.

DATED: June 16, 2015 **BROWN, NERI & SMITH LLP**

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues so triable.

DATED: June 16, 2015 **BROWN, NERI & SMITH LLP**

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri

# CERTIFICATE OF SERVICE

I, Geoffrey A. Neri, hereby declare under penalty of perjury as follows: I am an attorney at the law firm of Brown, Neri & Smith, LLP, with offices at 11766 Wilshire Blvd., Los Angeles, California 90025. On June 16, 2015, I electronically filed the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on June 16, 2015.

/s/ Geoffrey A. Neri